1
2
3
4
5
6
                    UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
7
                          AT SEATTLE

8  DAVID COSTELLO, SR.,

9                 Plaintiff,            Case No. C20-1330-BHS-MLP

10     v.

11  DANIEL RABELOS, *et al.*,          REPORT AND RECOMMENDATION

12                Defendants.

13

14         **I.**       **INTRODUCTION AND SUMMARY CONCLUSION**

15        This is a civil rights action brought under 42 U.S.C. § 1983. Plaintiff David Costello

16  alleges in this action that Defendants violated his constitutional rights when they used excessive

17  force in effectuating his arrest in January 2019. (Dkt. # 5, Complaint (Compl.) at 4-11.) Plaintiff

18  names as Defendants in his complaint City of Everett Police Detectives Daniel Rabelos and

19  Christopher Olsen, as well as other unknown officers of the Everett Police Department. (*Id*. at 1,

20  3.) Defendants now move for summary judgment, arguing that the force used against Plaintiff

21  was objectively reasonable and therefore did not violate Plaintiff's federal constitutional rights.

22  (*See* Dkt. # 13 (Mot.).) Plaintiff has been advised of the summary judgment requirements

23  pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998), but has filed no response to

REPORT AND RECOMMENDATION
PAGE - 1

Defendants' motion.[1] The Court, having reviewed Plaintiff's complaint, Defendants' motion for

summary judgment, and the balance of the record, concludes that Defendants' motion should be

granted, and that Plaintiff's complaint and this action should be dismissed with prejudice.

## II.    BACKGROUND

### A.    Factual Background

At issue in this action are events surrounding Plaintiff's arrest on January 14, 2019 by

officers of the Everett Police Department. The version of events alleged by Plaintiff in his

complaint is dramatically different from the version of events detailed by Defendants in their

motion papers. Among the documents submitted by Defendants in support of their summary

judgment motion are Defendants' First Set of Requests for Admission which were served on

Plaintiff during the discovery phase of this case, but which Plaintiff never responded to. (*See*

Dkt. # 16, Declaration of Ann E. Trivett (Trivett Decl.), ¶ 8, Ex. A.) Pursuant to Fed. R. Civ. P.

36(a)(3), the requests for admission are deemed admitted. These admissions are consistent with

the facts set forth in Detective Rabelos' and Detective Olsen's case reports which were prepared

contemporaneously with Plaintiff's arrest and which serve as the basis for Defendants' summary

judgment motion. (*See* Dkt. # 14, Declaration of Christopher Olsen (Olsen Decl.); Dkt. # 15,

Declaration of Daniel Rabelos (Rabelos Decl.).) The admissions are largely inconsistent with the

---

[1] Defendants originally attempted to serve their summary judgment papers on Plaintiff at his address of record, the Airway Heights Corrections Center ("AHCC"), but Plaintiff had by that time been released from custody and the attempt at service was unsuccessful. (*See* Dkt. # 22, ¶ 3; Dkt. # 23, Ex. A.) AHCC staff advised Defendants' counsel that Plaintiff had released homeless to Benton County, and they provided an address in Pasco, Washington for what appeared to be a motorhome. (Dkt. # 23, Ex. A at 1.) Defendants' counsel subsequently sent Defendants' motion papers to the address provided by AHCC staff. (Dkt. # 22, Exs. B-C.) There is no indication that that mail was returned as undeliverable, Defendants' counsel indicates only that she received no response to Defendants' motion, nor had she received any other communication from Plaintiff. (*Id.*, ¶ 8.) The Court presumes Plaintiff received Defendants' motion papers given that there is nothing to indicate Defendants' second attempt to serve their papers was unsuccessful.

REPORT AND RECOMMENDATION
PAGE - 2

1  allegations set forth by Plaintiff in his complaint. Because the parties' versions of events differ so

2  significantly, the Court will begin by summarizing Plaintiff's allegations and will then separately

3  set forth the facts relied upon by Defendants.

4          *1.    Plaintiff's Allegations*

5          Plaintiff alleges in his complaint that on the afternoon of January 14, 2019, he was out for

6  his daily ride on his BMX bike in downtown Everett, Washington, practicing for what he hoped

7  would result in sponsorship to ride BMX professionally. (Compl. at 4.) Approximately halfway

8  through his "course," as he was heading down Marine View Drive, he noticed a man in a small

9  SUV pointing at him. (*Id*. at 5.) According to Plaintiff, once he took notice of the individual in

10  the SUV, he saw "strobe" lights flashing out of the headlights and he stopped. (*Id*.) Upon

11  stopping, Plaintiff heard the man in the vehicle yelling at him, and then that man and another

12  man jumped out of the vehicle, pointed guns at him, and told him to lay on the ground. (*Id*.)

13  Plaintiff asserts it was at that point he realized the men were plainclothes officers and he

14  immediately complied with their directive to get on the ground because they had guns pointed at

15  him. (*Id*.)

16          Plaintiff claims that after he complied with the officers' directive, the officers, whom he

17  "assumes" were Detectives Rabelos and Olsen, "jumped" on him and then handcuffed him. (*Id*.)

18  Plaintiff further claims that immediately after he was handcuffed, the officers started yelling at

19  him to stop resisting, though he maintains he was not doing so and could not even move at that

20  point because he was pinned to the ground. (*Id*. at 5-6.) Plaintiff asserts that two or three

21  additional officers then began pulling him in different directions, hitting him the ribs and back,

22  and bashing his head into the concrete. (*Id*.) He asserts as well that at some point, officers

23  grabbed his legs and pulled them up behind him while either Detective Rabelos or Detective

REPORT AND RECOMMENDATION
PAGE - 3

Olsen put a knee on the back of his neck and clasped their hands together over Plaintiff's forehead, pulling his head back and choking him, causing him to not be able to breathe. (*Id*. at 6-7.) As Plaintiff squirmed to break free, the detectives let go of his forehead and started slamming Plaintiff's face into the concrete. (*Id*. at 7.)

Plaintiff asserts that the detectives repeated this process two more times, choking him and obstructing his breathing, all while the other officers yelled at him to stop resisting. (*Id*. at 7-8.) Plaintiff maintains that he was not resisting but would "buck" when he could not breathe. (*Id*. at 8.) Plaintiff claims that he bucked so hard on one occasion that he broke a bone in his left wrist. (*Id*.) According to Plaintiff, when the detectives subsequently picked him up to put him in the car, he had blood in his eyes and he could see blood dripping from his face onto the ground. (*Id*. at 9.) Plaintiff contends that he was still gasping for air as well. (*Id*.) Plaintiff was transported to the jail where he claims he saw a nurse who wrapped his injured wrist and made accommodations for him to receive a lower bunk since he could not climb to an upper bunk with his injured wrist. (*Id*. at 9-10.)

Plaintiff claims there was no reason for Detectives Rabelos and Olsen to act as they did because he never gave them a reason to make contact with him in the first place and he never resisted arrest or attempted to fight them. (*Id*.) Plaintiff believes the officers tried to take his life and have caused him permanent physical and mental damage. (*See id*. at 5, 10-11.)

### 2. *Defendants' Account of Use of Force Incident*

On January 14, 2019, Detectives Rabelos and Olsen were assigned to work the North Everett Emphasis Detail, an overtime-proactive policing detail focused on areas in the north end of Everett most impacted by criminal activity. (Rabelos Decl., Ex. A at 1; Olsen Decl., Ex. A at 2.) Because of the high-risk contacts associated with the detail, two officers are required to work

REPORT AND RECOMMENDATION
PAGE - 4

1    together. (Rabelos Decl., Ex. A at 1.) The area patrolled by the detail has so many issues with
2    criminal activity that there is also a bicycle unit assigned to patrol the area along with a two-
3    person foot patrol on certain days of the week. (*Id*.)

4         On the afternoon in question, Detectives Rabelos and Olsen were patrolling the area in a
5    blue Ford Explorer SUV equipped with lights and siren. (*Id*.) Detective Rabelos was driving
6    while Detective Olsen occupied the passenger seat. (*Id*.) Both detectives were in full police
7    uniform with various markings clearly identifying them as police. (*Id*.) Shortly after 3:00 p.m.,
8    the detectives observed an individual, later identified as David Costello, riding his BMX bicycle
9    eastbound on the sidewalk near the intersection of Hewitt Avenue and Wetmore Avenue where
10   the detectives were stopped at a traffic light. (Rabelos Decl., Ex. A at 1; Olsen Decl., Ex. A at 2.)
11   Pursuant to WAC 308-330-555, riding a bicycle on a sidewalk in a business district is prohibited,
12   and signs and concrete stamps throughout downtown Everett place individuals on notice of this
13   prohibition. (*See id*.)

14        As Plaintiff rode towards the detectives he stopped suddenly and made eye contact with
15   Detective Rabelos. (Rabelos Decl., Ex. A at 1.) Plaintiff then spun his bicycle around and started
16   quickly peddling southbound on the sidewalk away from the detectives. (Rabelos Decl., Ex. A at
17   1; Olsen Decl., Ex. A at 2.) At that point, Detective Rabelos had not activated any of the
18   emergency equipment on his vehicle and did not believe Plaintiff had any reason to flee.
19   (Rabelos Decl., Ex. A at 1.) Detective Rabelos was therefore suspicious that Plaintiff was fleeing
20   because he was engaged in criminal conduct beyond that of riding his bicycle on a downtown
21   sidewalk. (*Id*.) Detective Rabelos activated the emergency lights and siren on his patrol vehicle
22   and began to pursue Plaintiff. (Rabelos Decl., Ex. A at 1; Olsen Decl., Ex. A at 2.)

23

REPORT AND RECOMMENDATION
PAGE - 5

1    Plaintiff continued to pedal away from the pursuing detectives, cutting through alleys and

2    cutting across traffic, forcing vehicle traffic to stop to prevent a collision. (Rabelos Decl., Ex. A

3    at 1-2; Olsen Decl., Ex. A at 2.) At one point, Plaintiff appeared to be tiring and Detective Olsen

4    got out of the police vehicle to chase Plaintiff on foot. (Rabelos Decl., Ex. A at 2.) Plaintiff,

5    however, continued to evade the detectives and another officer, Detective Paxton, eventually

6    joined the pursuit and took the lead in pursuing Plaintiff. (*Id*.) As the pursuit continued, and

7    Plaintiff appeared to be tiring further, Detective Rabelos saw Plaintiff begin reaching for

8    something in his pockets. (*Id*.) Because Detective Rabelos did not know whether Plaintiff was

9    armed or was attempting to destroy evidence, he used his radio to advise officers in assisting

10   units that Plaintiff was reaching into his pockets. (*See id*.)

11   Plaintiff turned onto Marine View Drive while still attempting to reach into his pockets,

12   prompting Detective Rabelos to again advise assisting units to be aware of that fact. (*Id*.)

13   Plaintiff finally stopped and dropped his bicycle when an officer in another vehicle, Officer

14   White, approached from the opposite direction and Plaintiff became boxed in. (*Id*.) Plaintiff was

15   ordered to get on his stomach, and he started to comply but did not go down completely. (*Id*.)

16   When it appeared that Plaintiff might get up and attempt to flee again on foot, Detective Rabelos

17   moved in and took a hold of Plaintiff's left arm in an effort to control him and pull him to the

18   ground flat on his stomach. (*Id*.) Plaintiff started actively fighting Detective Rabelos, trying to

19   pull his arm away and roll the detective under him. (*Id*.) As he did this, Plaintiff pulled his right

20   hand underneath his body in the area where he had been reaching during the pursuit. (*Id*.)

21   Detective Rabelos began yelling for Plaintiff to stop resisting and told him he was under arrest,

22   but Plaintiff did not stop resisting. (*Id*.) Plaintiff continued to fight and to try and pull his arm

23

REPORT AND RECOMMENDATION
PAGE - 6

away, and Detective Rabelos yelled to the other units to watch Plaintiff's right hand and control it because he had been reaching for something. (*Id.*)

Plaintiff displayed exceptional strength as he resisted Detective Rabelos' efforts to gain control of him, pulling his left arm up towards his head even with Detective Rabelos holding on with both hands and using all of his body weight to hold Plaintiff's arm back towards a cuffing position. (*Id.*) Detective Rabelos yelled for other officers to assist and as more officers stepped in Detective Rabelos grew increasingly concerned for officer safety as Plaintiff was still able to actively resist even with several officers on him. (*Id.*) Plaintiff was able to break Detective Rabelos' control of his wrist and hand at one point, pulling it up towards his head and underneath his body. (*Id.*, Ex. A at 2-3.) Plaintiff then started pushing himself up to continue fighting with officers as Detective Rabelos continued to command that he stop resisting and as Plaintiff continued to ignore those commands. (*Id.*, Ex. A at 3.)

Because of Plaintiff's ongoing resistance, Detective Rabelos considered using a higher level of force in the form of knee strikes because he knew that such an impact could cause relaxation in Plaintiff's muscles thus allowing officers to overcome his resistance. (*Id.*) Before Detective Rabelos could get into position to use knee strikes, another officer used some type of impact strike on Plaintiff which caused relaxation in his resistance. (*Id.*) At that point, Detective Rabelos and Officer White were able to get Plaintiff's left arm back and into a cuffing position. (*Id.*) Once Plaintiff's left hand was cuffed, other officers were able to get Plaintiff's right hand cuffed with a second pair of handcuffs and the two pairs of handcuffs were then cuffed together. (*Id.*) Plaintiff was thereafter held on the ground until leg restraints could be applied. (*Id.*)

When Detective Olsen arrived at the location where Plaintiff had finally been stopped, Plaintiff was on the ground actively resisting the efforts of four or five officers to place him into

REPORT AND RECOMMENDATION
PAGE - 7

1    handcuffs by pulling his hands underneath his body. (Olsen Decl., Ex. A at 2.) Detective Olsen

2    also noted that Plaintiff was kicking his feet in an effort to prevent officers from gaining control

3    of him while ignoring commands to stop resisting. (*Id.*)

4          Once Plaintiff was restrained, Detective Rabelos observed that Plaintiff had sustained

5    some minor scrapes on his face and hands from the pavement, injuries consistent with "road

6    rash." (Rabelos Decl., Ex. A at 3.) Detective Olsen likewise observed that Plaintiff had sustained

7    abrasions to the knuckles on the middle and ring fingers of his right hand, as well as abrasions on

8    both sides of his head, and possibly his nose. (Olsen Decl., Ex. A at 2.) The Everett Fire

9    Department ("EFD") was requested to respond to the location to evaluate Plaintiff. (*Id.*)

10   Detective Rabelos continued to monitor Plaintiff and his breathing as aid was called because

11   Plaintiff appeared physically exhausted from the pursuit and from his efforts to resist being taken

12   into custody. (Rabelos Decl., Ex. A at 3.)

13         While awaiting aid, Detective Rabelos began searching Plaintiff to make sure he did not

14   have any weapons. (*Id.*) Detective Rabelos located several used needles and a pack of new

15   needles in Plaintiff's right pocket, the area where Plaintiff had been reaching during the pursuit.

16   (*Id.*) Though Plaintiff had no identification on him, he eventually told officers who he was and

17   officers thereafter learned that Plaintiff had a felony warrant for escape from the Department of

18   Corrections, as well as an outstanding warrant with the Mount Vernon Police Department for

19   making false statements and obstructing law enforcement. (Rabelos Decl., Ex. A at 3, Olsen

20   Decl., Ex. A at 2.)

21         EFD arrived on the scene and evaluated Plaintiff for injuries. (*Id.*) They determined that

22   Plaintiff required no further treatment or evaluation and was fine for booking. (*See id.*)

23   Detectives Rabelos and Olsen then helped Plaintiff up to take him to their patrol vehicle.

REPORT AND RECOMMENDATION
PAGE - 8

1    (Rabelos Decl., Ex. A at 3.) While they were helping Plaintiff to the car, he continuously

2    apologized to the officers for fleeing and fighting. (*Id*.) Plaintiff was transported to the

3    Snohomish County Jail where he was booked for resisting arrest, disorderly conduct, and his

4    felony warrant for escape. (Rabelos Decl., Ex. A at 3; Olsen Decl., Ex. A at 2.)

5            Plaintiff, by way of his non-response to Defendants' requests for admissions, admitted

6    that he saw uniformed officers driving in a patrol vehicle in downtown Everett on January 14,

7    2019, and that when he saw the officers stop the vehicle he fled from them on his bicycle.

8    (Trivett Decl., Ex. A at 2.) Plaintiff also admitted that at one point there were at least three patrol

9    cars pursuing him and that he encountered at least one officer pursuing him on foot for whom he

10   failed to stop. (*Id*., Ex. A at 2-3.) Plaintiff admitted that he reached into his pocket on at least two

11   occasions while he was fleeing. (*Id*., Ex A at 3.) Plaintiff further admitted that he struggled with

12   officers during the course of his arrest, that he reached into his pocket during his struggle with

13   officers, that he resisted officers' attempts to handcuff him, that he attempted to get up and flee

14   from officers while lying on his stomach, and that Officer Olsen was not one of the officers who

15   placed him under arrest. (*Id*., Ex. A at 4-6.) Finally, Plaintiff admitted that he pleaded guilty to

16   obstruction related to his January 14, 2019 arrest, and that his plea included an admission he had

17   physically resisted officers' efforts to place him in handcuffs. (*Id*., Ex. A at 6-7.)

18                                           **III.**     **DISCUSSION**

19   **A.**     **Applicable Standards**

20             *1.*    *Summary Judgment Standard*

21           Summary judgment is appropriate when a "movant shows that there is no genuine dispute

22   as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

23   56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party

REPORT AND RECOMMENDATION
PAGE - 9

fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

REPORT AND RECOMMENDATION
PAGE - 10

1   "The mere existence of a scintilla of evidence in support of the non-moving party's position is

2   not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d

3   1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with

4   allegations in the complaint, or with unsupported conjecture or conclusory statements."

5   *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

6                    2.    *Section 1983 Standard*

7          In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that

8   he suffered a violation of rights protected by the Constitution or created by federal statute, and

9   (ii) that the violation was proximately caused by a person acting under color of state law. *See*

10  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is

11  satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

12  another's affirmative act, or omitted to perform an act which he was legally required to do that

13  caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981)

14  (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

15      **B.    Analysis**

16         Plaintiff asserts that Defendants violated his rights under the Eighth and Fourteenth

17  Amendments when they used excessive force against him in effectuating his arrest. (Compl. at

18  4.) The United States Supreme Court has made clear that all claims that law enforcement officers

19  used excessive force in the course of an arrest must be analyzed under the Fourth Amendment's

20  reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Supreme Court

21  explained in *Graham* that "the 'reasonableness' inquiry in an excessive force case is an objective

22  one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts

23  and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*

REPORT AND RECOMMENDATION
PAGE - 11

1    at 397 (citation omitted). The Court cautioned that reasonableness must be assessed from the

2    perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,

3    and must allow for the fact that "police officers are often forced to make split-second judgments

4    – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force

5    that is necessary in a particular situation." *Id.*

6         To determine whether the force allegedly used was objectively reasonable, the Court

7    must balance "the nature and quality of the intrusion on the individual's Fourth Amendment

8    interests against the countervailing governmental interests at stake." *Id.* at 396. In other words,

9    the Court weighs the type and amount of force inflicted against the severity of the crime at issue,

10   whether the suspect poses an immediate threat to the safety of officers or others, whether the

11   suspect is actively resisting arrest or attempting to evade arrest by flight, and any other relevant

12   factors. *See id.*; *Jackson v. City of Bremerton*, 268 F.3d 646, 651-52 (9th Cir. 2001); *Bryan v.*

13   *MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

14        The Court first considers the type and amount of force inflicted during the incident in

15   question. Defendants' evidence demonstrates that Detective Olsen had no physical contact with

16   Plaintiff at all until after he was arrested. (Olsen Decl., Ex. A at 2; Trivett Decl., Ex. A at 6.)

17   Defendants' evidence further demonstrates that Detective Rabelos merely restrained Plaintiff by

18   grabbing onto his wrist and arm, and that Detective Rabelos subsequently used his arms and his

19   body weight to hold onto Plaintiff's arm in an effort to gain control of Plaintiff and to get his arm

20   into a cuffing position. (Rabelos Decl., Ex. A at 2.) Though another unnamed officer escalated

21   the force by using impact strikes on Plaintiff when he continued resisting officers' efforts to

22   handcuff him, nothing suggests that the number of strikes was excessive or that they caused

23   Plaintiff any injury. (*Id.*, Ex. A at 3.) Moreover, according to Detective Rabelos, whoever used

REPORT AND RECOMMENDATION
PAGE - 12

these strikes prevented a further escalation of force because they caused some relaxation in Plaintiff's resistance. (*Id.*)

While Plaintiff asserts that he suffered significant injuries as a result of Defendants' conduct, he provides no evidence to support this assertion nor any evidence of his own to rebut Defendants' evidence that he suffered only minor abrasions to his hands and face during the incident. In sum, the record demonstrates that the force employed by Detective Rabelos during Plaintiff's arrest was minimal and that Detective Olsen employed no force whatsoever.

The Court now considers the government's interest in the use of force by evaluating the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer or others, whether the suspect was actively resisting arrest or attempting to evade arrest, and any other relevant factors. As to the first factor, the severity of Plaintiff's crime, the record reflects that what began as a relatively benign observation by Defendants that Plaintiff was riding his bike on a downtown sidewalk in violation of WAC 308-330-555, escalated into a more serious situation when Plaintiff abruptly fled from officers, giving rise to a suspicion that Plaintiff was in involved in more serious criminal activity. (Rabelos. Decl., Ex. A at 1.) Plaintiff led multiple officers on a pursuit through downtown Everett and then resisted efforts to take him into custody. (*Id.*; Olsen Decl., Ex. A at 2; Trivett Decl., Ex. A at 2-5.) This conduct resulted in the filing of charges against Plaintiff for disorderly conduct and resisting arrest. (Olsen Decl., Ex. B.) While the resulting charges were misdemeanors, they were committed in such a fashion as to clearly place the public and the officers at risk. This factor favors Defendants.

The second factor, whether Plaintiff posed an immediate threat to the safety of the officers or others, is the most important of the three specific factors identified in *Graham*. *Bryan*, 630 F.3d at 826 (citing *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005)). The "threat

REPORT AND RECOMMENDATION
PAGE - 13

analysis must be based on objective factors and not merely 'a simple statement by an officer that he fears for his safety or the safety of others.'" *Nelson v. City of Davis*, 685 F.3d 867, 880 (9th Cir. 2012) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)). As discussed above, Plaintiff fled from the detectives and led them and several other officers on a pursuit which endangered both the officers and the public. Plaintiff reached into his pocket during the pursuit and then reached for the same area again while he was lying on the ground struggling with officers, thus giving rise to a suspicion that he could have a weapon in his possession. Finally, Plaintiff actively and vigorously resisted officers' efforts to effectuate his arrest. The second factor clearly favors Defendants as well.

The third factor, whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight, is easily established for the reasons described above. While Plaintiff asserts in his complaint that he never resisted arrest or attempted to fight officers, Defendants' evidence and Plaintiff's own admissions reflect differently. This factor also favors Defendants.

The Court now turns to the dispositive question of whether the force applied was reasonably necessary under the circumstances. The force applied by Detective Rabelos was minimal and viewing the evidence in the record from the perspective of a reasonable officer on the scene, the level of force employed was objectively reasonable under the circumstances. Defendant Rabelos is therefore entitled to summary judgment with respect to Plaintiff's excessive force claim. Defendant Olsen is likewise entitled to summary judgment as there is no evidence in the record that he participated in any use of force against Plaintiff.

REPORT AND RECOMMENDATION
PAGE - 14

## IV.    CONCLUSION

For the foregoing reasons, this Court recommends that Defendants' motion for summary

judgment be granted and that Plaintiff's complaint and this action be dismissed with prejudice. A

proposed order accompanies this Report and Recommendation.

## V.    OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and

served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report

and Recommendation is signed. Failure to file objections within the specified time may affect

your right to appeal. Objections should be noted for consideration on the District Judge's

motions calendar for the third Friday after they are filed. Responses to objections may be filed

within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter

will be ready for consideration by the District Judge on **August 13, 2021**.

DATED this 21st day of July, 2021.

_____
MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 15